**RED GIANT OIL COMPANY,**
**A Corporation, Appellant,**

v.

**William LAWLOR and LeMars Mutual**
**Insurance Company, A Corporation,**
**Appellees.**

**No. 93–1566.**

Supreme Court of Iowa.

March 29, 1995.

Robert V. Rodenburg of Rodenburg Law Office, P.C., Council Bluffs, for appellant.

Patrick G. Vipond, William R. Settles, John M. French, and Frederick T. Harris of Kennedy, Holland, DeLacy & Svoboda, Omaha, NE, and David F. McCann of Dippel & McCann, P.C., for appellee Lawlor.

William Kevin Stoos, Rene Charles Lapierre, and James R. Villone of Klass, Hanks, Stoos, Stoik & Villone, Sioux City, for appellee LeMars Mut.

Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

Red Giant Oil Company appeals from a summary judgment ruling against it in its

action against William Lawlor and LeMars Mutual Insurance Company. The action against Lawlor is based on Lawlor's alleged failure to procure coverage for Alfred Coyle, d/b/a Alco. The action against LeMars is based on its alleged bad faith in denying coverage and representation to Coyle.

Previous to this action Red Giant had sued Coyle for alleged negligent work on its premises. Ultimately, Red Giant and Coyle settled. As part of the settlement, Coyle confessed judgment for the full amount of Red Giant's damages and assigned his rights against Lawlor and LeMars to Red Giant. In exchange, Red Giant agreed not to execute on the judgment. Also, as part of this settlement, Coyle and Union Insurance Company—an additional insurer of Coyle's—agreed to loan Red Giant $16,500 at no interest. Red Giant agreed to pursue the claims against Lawlor and LeMars and, if successful, to repay a part of the loan.

After Lawlor and LeMars moved for summary judgment, Red Giant, Coyle, and Union Insurance amended their settlement agreement to exclude Red Giant's agreement not to execute on the judgment against Coyle. The district court then sustained Lawlor's and LeMars' motions for summary judgment.

We reverse and remand for further proceedings consistent with this opinion.

## I. *The Facts.*

In September 1992, Red Giant sued Lawlor and LeMars. Division I of the petition alleges the following facts. Red Giant is the assignee of Coyle as to all claims, rights, causes of action, and choses in action that Coyle has against LeMars and its agent Lawlor.

LeMars had issued Coyle an insurance policy and represented that the policy insured Coyle for liability for negligent welding and related work activities.

Coyle did negligent welding on Red Giant's oil tanks in January 1990, causing damage to Red Giant in excess of $58,351. This damage occurred about a year after the work was done.

Coyle notified LeMars which investigated the incident, denied coverage, and willfully failed and refused to defend Coyle in Red Giant's suit against Coyle.

Lawlor—as agent for LeMars—had told Coyle that the LeMars policy covered losses like those Red Giant had suffered because of Coyle's negligent work. Coyle relied on this representation of coverage, causing damage to Coyle and to Red Giant as Coyle's assignee.

Red Giant obtained a judgment against Coyle for $58,351.32 together with interest and costs. Coyle suffered damages proximately caused by LeMars' breach of its policy. Red Giant prays for judgment against LeMars and Lawlor.

Division II repleads all of these facts and further alleges that LeMars and Lawlor are guilty of bad faith in the handling of Coyle's liability claim and in the sale and administration of the policy. This division also alleges that Red Giant has been damaged by this conduct and prays for judgment against both defendants.

Division III repleads all of the facts of Division I. It further alleges that Lawlor intentionally and recklessly misrepresented to Coyle the nature and extent of the insurance policy after Coyle expressly asked Lawlor for the precise coverage for liability for damages like Red Giant had suffered. In this division, Red Giant also prays for judgment against both defendants.

In July 1992—before the present lawsuit was filed—Red Giant, Coyle, and Union Insurance reached a settlement of Red Giant's suit against Coyle which had been filed in April 1991. According to the agreement, the parties acknowledge that coverage to Coyle under his policy with Union Insurance is doubtful but Coyle's claims for "coverage and other causes of action" against LeMars and its agent Lawlor "exist and are viable." The parties further acknowledge that they "desire to protect their rights and extinguish their liability in the controversy as to the claims, each against the other."

The parties go on to agree in pertinent part as follows:

1. Coyle and Union will loan Red Giant $16,500 without interest.

2. Coyle and Union do not admit liability to Red Giant because of the alleged negligent work.

3. Judgment can be entered by Red Giant against Coyle for Red Giant's actual damages in the amount of $58,351.32.

4. In consideration of the loan, Coyle assigns to Red Giant all his rights of action against LeMars for its failure to defend him or LeMars and/or Lawlor for failure to provide coverage for Red Giant's action against Coyle.

5. In consideration for the assignment, Red Giant agrees not to institute suit against Coyle or Union for any claims and agrees not to execute upon any judgment against Coyle and/or Union arising out of Red Giant's suit against Coyle.

6. Red Giant agrees to pursue the claims against LeMars and/or Lawlor and to collect any judgment it may obtain against the two.

7. In the event Red Giant recovers anything, it agrees to pay Union a proportionate amount of the recovery less an attorney fee and costs. If Red Giant recovers nothing, the loan is satisfied and extinguished.

8. In consideration of the $16,500 loan to Red Giant, Coyle releases any policy rights he may have against Union for any claims relating to Red Giant's suit against him.

On July 30, 1992, on Coyle's previous offer to confess judgment, the district court rendered judgment against Coyle in favor of Red Giant in the amount of $58,351.32.

After LeMars and Lawlor moved for summary judgment, Red Giant, Coyle, and Union Insurance amended their agreement by striking Red Giant's agreement not to execute any judgment against Coyle. In the amendment, Red Giant agrees, however, not to enforce against Union Insurance any judgment obtained against Coyle.

## II. *The Scope of Review.*

We review the grant or denial of summary judgment under well-known standards. Our review is at law. Iowa R.App.P. 4. Summary judgment is proper only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Iowa R.Civ.P. 237. To determine whether a genuine issue of material fact exists, the court must examine the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *Id.* The burden is on the moving party to show the absence of a material fact issue, and the resisting party is accorded all possible inferences reasonably deducible from the evidence. *Central Nat'l Ins. Co. v. Insurance Co. of N. Am.,* 522 N.W.2d 39, 42 (Iowa 1994) (citations omitted). On appeal, our task is to determine whether a genuine issue of material fact exists and whether the law was correctly applied. *Ottumwa Hous. Auth. v. State Farm Fire & Casualty Co.,* 495 N.W.2d 723, 726 (Iowa 1993).

## III. *The Issue and the Two Lines of Authority.*

The commercial general liability policy Coyle had obtained from LeMars provides in pertinent part:

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement.

a. We will pay those sums that the insured *becomes legally obligated to pay* as damages because of "bodily injury" or "property damage" to which this insurance applies.

(Emphasis added.)

In determining that summary judgment for LeMars and Lawlor was proper, the district court focused on the policy language *legally obligated to pay* and relied on two federal cases: *Freeman v. Schmidt Real Estate & Insurance, Inc.,* 755 F.2d 135 (8th Cir.1985), and *Roach v. Estate of Ravenstein,* 326 F.Supp. 830 (S.D.Iowa 1971).

In *Freeman,* the facts were similar to those here. Freeman and Mrs. Catron were involved in an automobile collision. Mrs. Catron was operating a vehicle owned by her husband. In settlement of the resulting litigation, the Catrons confessed judgment and assigned to Freeman their rights against their insurance agent and insurer for failing to procure insurance that would have covered

the liability that Freeman asserted against the Catrons. In consideration, Freeman promised not to execute on the judgment. Thereafter, Freeman sued the insurance agent and insurer alleging—as the Catrons' assignee—that the insurance agent and insurer were negligent and breached an oral contract in failing to obtain additional insurance that would have covered the full judgment. (The Catrons had $50,000 of liability insurance and confessed judgment for $350,000 and costs.)

The trial court sustained the defendants' motion for summary judgment. It concluded that because the Catrons never became legally obligated to make any payments to Freeman because of the covenant not to execute, the Catrons would have been entitled to nothing under the policy and for that reason suffered no damages. The trial court further concluded that as a result Freeman received no enforceable rights from the Catrons against either the agent or the insurer. (In reaching this conclusion, the trial court was obliged to follow Iowa law but acknowledged there was no Iowa case directly on point.)

The issue on appeal was "whether an insurer may be liable to the injured party when the insured before judgment is protected by an agreement not to execute." *Id.* at 137. This is precisely the issue in this appeal.

In deciding the issue, the *Freeman* court recognized there were two lines of authority on whether an insurer may be liable to the injured party when the insured before judgment is protected by an agreement not to execute. Both lines of authority focus on the policy language that requires an insurer to pay only such amounts that the insured "shall become legally obligated to pay as damages." *Id.*

Courts following the first line of authority reason that a

> covenant not to execute ... is merely a contract, and not a release, such that the underlying tort liability remains and a breach of contract action lies if the injured party seeks to collect his judgment. Thus, the tortfeasor is still "legally obligated" to the injured party, and the insurer still must make good on its contractual promise

to pay. An uninsured party would then be injured by the agent's negligence in failing to procure a policy because he would have the outstanding "liability" against which he sought to insure.

*Id.* at 137–38 (citations omitted); *see also Gray v. Grain Dealers Mut. Ins. Co.,* 871 F.2d 1128, 1133 n. 7 (D.C.Cir.1989); *State Farm Mut. Auto. Ins. Co. v. Paynter,* 122 Ariz. 198, 203, 593 P.2d 948, 953 (Ariz.Ct. App.1979); *Globe Indem. Co. v. Blomfield,* 115 Ariz. 5, 8, 562 P.2d 1372, 1375 (Ariz.Ct. App.1977); *Miller v. Shugart,* 316 N.W.2d 729, 732 (Minn.1982). *Cf. Critz v. Farmers Ins. Group,* 230 Cal.App.2d 788, 804, 41 Cal. Rptr. 401, 410 (1964) (agreement holding tortfeasor harmless as to judgment in excess of tortfeasor's insurance coverage does not foreclose suit against insurer for bad faith failure to settle).

The *Freeman* court recognized that there are other cases which simply ignore the distinction between covenant and release. Rather, these cases rely "primarily on the right of the insured to protect himself from bad faith conduct of his insurer." *Freeman,* 755 F.2d at 138.

The leading case following this rationale is *Metcalf v. Hartford Accident & Indemnity Co.,* 176 Neb. 468, 126 N.W.2d 471 (1964). *Metcalf* holds that insureds—and thus insurers—are "legally obligated to pay" within the meaning of the policy despite an agreement not to execute when the insureds enter into such agreements to protect themselves from insurers' denial of coverage and refusal to defend under the policy. *Id.* at 475, 126 N.W.2d at 476. Other courts following the *Metcalf* rationale include *Coblentz v. American Surety Co.,* 416 F.2d 1059, 1062–63 (5th Cir.1969); *American Family Mutual Insurance Co. v. Kivela,* 408 N.E.2d 805, 812–13 (Ind.Ct.App.1980).

The second line of authority—and the one urged by the agent and insurer in *Freeman*—gives the "legally obligated to pay" language a practical construction:

> An insured protected by a covenant not to execute has no compelling obligation to pay any sum to the injured party; thus, the insurance policy imposes no obligation

on the insurer. An individual who is uninsured due to an agent's negligence then will have suffered no damages, as he would have had no rights under the policy anyway.

*Freeman,* 755 F.2d at 138 (citations omitted).

Some of the courts following this line of authority are primarily concerned about possible collusion between the insured and the injured party assignee. *Freeman,* 755 F.2d at 138–39; *Steil v. Florida Physicians' Ins. Reciprocal,* 448 So.2d 589, 592 (Fla.Dist.Ct. App.1984) (suspicion of collusion and fraud led court to deny effect to settlement and assignment; in addition, court indicated that such an agreement may be upheld where free from taint). Other courts have, without further analysis, simply relied on the practical construction of the "legally obligated to pay" language, concluding that because the insured has no obligation to pay, neither does the insurer. *See, e.g., Bendall v. White,* 511 F.Supp. 793, 795 (N.D.Ala.1981) (mem.); *American Casualty Co. v. Griffith,* 107 Ga. App. 224, 227, 129 S.E.2d 549, 551–52 (1963); *Huffman v. Peerless Ins. Co.,* 17 N.C.App. 292, 293, 193 S.E.2d 773, 774, *cert. denied,* 283 N.C. 257, 195 S.E.2d 689 (1973); *Stubblefield v. St. Paul Fire & Marine Ins. Co.,* 267 Or. 397, 400, 517 P.2d 262, 264 (1973) (en banc).

While pointing out that the second line of authority prevents the use of settlements used by Freeman and the Catrons, the court nevertheless believed that Iowa public policy would prohibit such agreements. *Freeman,* 755 F.2d at 138–39. The court gave several reasons why it thought that way. First, an Iowa injured party who has an uncollectible judgment has other means to gain an insured's rights against the insurer. *Id.* at 139. For example, the injured party could sue the insurer under Iowa's direct action statute. *See* Iowa Code § 516.1 (1991) (permitting such an action in event an execution on a judgment against insured is returned unsatisfied in suit by injured party against insured).

Second, the additional procedure of prejudgment assignment in return for a promise not to execute should not be available because of possible collusion. *Freeman,* 755

F.2d at 139. As to this reason, the court relied heavily on a local federal district court's decision in *Roach,* 326 F.Supp. at 834.

In *Roach,* the federal district court denied a motion for a consent judgment on a settlement. The settlement involved an assignment by the administrator of the deceased insured's rights against the insurer in exchange for the injured party's agreement to seek satisfaction of the judgment only from the estate's rights in the insurance policy. The court held that the agreement was beyond the authority of the administrator because of the administrator's failure to (1) investigate the merits of the claim against the insurer, or (2) seek necessary probate court approval. *Id.* The court additionally held that the agreement was unconscionable because it forced the insurer either to forgo a good faith denial of coverage or risk being bound by any settlement the insured may choose to make. *Id.* at 837. The plaintiff's counsel had actually been directing the administrator's actions. *Id.* This led the federal district court to find that the purpose of the agreement had been to "relieve the plaintiff from the burden of proving its claim and establishing the liability of the defendant estate and to prevent a defense by the insurer." *Id.* at 834.

The *Freeman* court believed this type of collusion was possible any time the insured is protected by an agreement not to execute before entry of judgment. It is possible, the court reasoned, because the insured loses the incentive to contest liability or the extent of the injured party's damages either in negotiations or at trial. *Freeman,* 755 F.2d at 139.

Last, the policy concerns that cause some states to permit such settlements are

less pressing when the claim against the insurer is to be negligent failure to procure insurance rather than bad faith refusal to settle or to defend. Insureds and injured parties alike may need the possibility of an assignment and covenant not to execute as a weapon against insurer misconduct surrounding claims made under the policy. When the insurer's breach of its obligations, however, is merely negligent and is removed in time and nature from the

settlement context, such agreements will have less deterrent effect on insurer practices, and their possible usefulness in this regard is outweighed by the concern with collusion.

*Id.*

The court in *Freeman* went on to agree with the magistrate's prediction that "Iowa courts would read the 'legally obligated to pay' policy language to protect insurers when their insureds are protected by prejudgment covenants not to execute." *Id.*

There was a dissent in *Freeman.* The dissent predicted our courts would be more likely to follow the view of those cases that would permit recovery than those that would not. The dissent however suggested the following:

> Of course, in any action, the insured would have to prove his damages and the insurer would have a right to assert any defense that it might have had if the insurance had been purchased as requested. This simple safeguard would prevent any collusive settlement.

*Id.* at 141 (Heaney, J., dissenting). The dissent saw no policy reasons to deny relief; to the contrary, the dissent believed that the negligent insurer—rather than the innocent plaintiff—should bear the responsibility for the loss. *Id.*

## IV. *The Merits.*

■ For reasons that follow, we are more convinced by the line of authority permitting the settlement agreements in question than we are with the line of authority that does not. As we mentioned earlier, one of the leading cases approving of such agreements is *Metcalf.*

Because the facts in *Metcalf* are somewhat similar to the facts here, we recite them. In an underlying tort suit, a party injured in a collision sued an insured under a policy on the other car involved. The insurer disavowed coverage and refused to defend the insured. During the course of trial, the parties settled. As part of the settlement the insured consented to an entry of judgment against him for $4500 and costs. The injured party agreed not to attempt collection from any assets of the insured other than insur-

ance policies that covered the insured. Following entry of judgment, the injured party garnished the insurer on the judgment. The insurer defended on two grounds. First, the insurer claimed there was no coverage. Second, the policy obligated the insurer to pay "all sums which the insured shall become legally obligated to pay as damages." The judgment and the agreement—the insurer argued—created no obligation to pay on the part of the insured and, therefore, no obligation on the part of the insurer to pay. *Metcalf,* 176 Neb. at 474, 126 N.W.2d at 475.

The trial court found against the insurer on both issues. The appellate court agreed. As to the second defense, the appellate court concluded that the judgment in the underlying tort action created a legal liability within the meaning of the policy. In reaching this conclusion, the court said:

> The [insurer] is obligated under its insurance policy to defend the suit brought against [the insured].... This it refused to do. [The insured] was thereupon required to engage an attorney and provide his own defense. With the insurance company denying liability, [the insured] was entitled to use all reasonable means of avoiding personal liability. It was to [the insured's] personal interest to consent to the $4500 judgment and accept an agreement from the [injured party] not to execute on [the insured's] property other than any rights to indemnity he might have in the designated insurance policies. The matter is of no consequence to [the insurer] if its claim of nonliability is correct. Since its claim of nonliability has no validity, and it having declined to defend the action when called upon to do so, the [insurer] is in no position to attack the judgment in the absence of fraud, collusion, or bad faith. If the judgment was obtained in good faith, the [insurer] may not again litigate the issues that resulted in the judgment.

*Metcalf,* 176 Neb. at 475, 126 N.W.2d at 475–76.

In replying to the insurer's defense regarding the policy language, the *Metcalf* court quoted the following passage from

*Fullerton v. United States Casualty Co.,* 184 Iowa 219, 167 N.W. 700 (1918):

> We are cited to a clause of the contract to the effect that the right of the insured to maintain an action against the company is limited to cases of "loss actually sustained and paid in money in satisfaction of a judgment after trial of the issue," and it is said that the payment of Mrs. Jacobson by plaintiff was by way of a settlement, and not in satisfaction of a judgment. *But this provision can avail the appellant nothing in this case. It repudiated its obligation to assume and carry the defense to final judgment, and having abandoned the case, it left the [insured] at liberty to take up the defense and contest the claim to final judgment, or, if so advised, to make the most favorable settlement possible.*

*Metcalf,* 176 Neb. at 475, 126 N.W.2d at 476 (emphasis added) (quoting *Fullerton v. United States Casualty Co.,* 184 Iowa 219, 231–32, 167 N.W. 700, 705 (1918) (suit by insured against insurer)).

The rationale expressed in the quoted passages from *Metcalf* and *Fullerton* simply means that an insurer may not hide behind the language of the policy after the insurer abandons its insured and the insured settles the claim by agreement. The language we refer to is "legally obligated to pay" in *Metcalf* and "loss actually sustained and paid in money in satisfaction of a judgment" in *Fullerton.*

Having resolved the policy language defense against the insurer, the *Metcalf* court proceeded to decide the case on the basis of a well-settled indemnity rule. The rule provides that, in the absence of fraud or collusion, an insurance company that refuses to defend its insured is bound by a judgment against the insured with respect to all matters which were litigated or could have been litigated in that action. *Paynter,* 122 Ariz. at 200, 593 P.2d at 950; *see also Jones v. Southern Sur. Co.,* 210 Iowa 61, 69, 230 N.W. 381, 385 (1929). This rule is based upon

> the broad duty of the insurer to defend claims under policy provisions [in which the insurer agrees to defend the insured]. Under such [language], the insured is enti-

tled to a defense in any case in which there is coverage under the policy. "A purchaser of liability insurance has a right to expect not only indemnification at the end but also a shield against liability claims at the outset." By refusing to defend, the insurer takes the risk that it may have erred in determining that the policy did not provide coverage. Having refused to provide a defense, the insurer is said to have been "vouched in" the action against the insured and is bound by the judgment. In the absence of fraud or collusion, it is not entitled to relitigate the merits of the claim.

*Paynter,* 122 Ariz. at 200, 593 P.2d at 950–51 (citations omitted).

Applying this indemnity rule, the *Metcalf* court noted that the insurer had neither pleaded nor proven fraud or collusion. The insurer did, however, contend the judgment was unreasonable. The court assumed this bore on the question of fraud or collusion but concluded that the record evidence supported a finding that the judgment was reasonable and within the range of a potential jury verdict. *Metcalf,* 176 Neb. at 475, 126 N.W.2d at 476.

In face of this indemnity rule, an insurer has two options when it is asked to defend an action against its insured. It can defend with notice to the insured that it is reserving the right to challenge its liability on the policy. Or, it can repudiate liability, refuse to defend, and take its chances. *Elliot v. Casualty Ass'n of Am.,* 254 Mich. 282, 285, 236 N.W. 782, 783 (1931). If it chooses the latter option, then in the absence of fraud or collusion, *Elliot* holds that the insurer should be bound by the judgment. *Id.* at 285, 236 N.W. at 783.

After carefully considering both lines of authority discussed in division III of this opinion, we reach the following conclusions. First, the original covenant not to execute was merely an agreement by Red Giant and was not a release. Coyle's underlying tort liability therefore remains. Coyle would have a breach of contract remedy if Red Giant tried to collect on the judgment against him. Coyle is therefore still "legally obligat-

ed" to Red Giant, and LeMars must still make good on its policy promise to pay, if there is coverage. *See Renner v. Model Laundry, Cleaning & Dyeing Co.*, 191 Iowa 1288, 1304, 184 N.W. 611, 618 (1921) (covenant not to sue does not operate to release or discharge from liability any person other than covenantee).

■ The outstanding liability against Coyle means there is potential damage because of Lawlor's failure to procure the correct coverage. So the action against Lawlor is viable if there is no coverage.

■ Our interpretation of the "legally obligated to pay" language in the policy is consistent with insurance policy rules of construction. The policy does not define "legally obligated to pay." At best, this language is ambiguous. Because it is ambiguous, we construe it in favor of the insured. *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 618–19 (Iowa 1991).

Second, we think the *Metcalf* rationale which is based on *Fullerton*—an Iowa case—provides an additional reason to hold that a stipulated judgment and covenant not to execute do not invalidate coverage. As we said, that rationale simply means that an insurer may not hide behind policy language after it abandons its insured and the insured settles the claim by such an agreement.

■ Third, we agree with those courts which hold that a claim by an insured against the insurer for failure of the insurer to defend may be assigned to the injured party. Prejudgment assignments—like the one here—in return for covenants not to execute are not inherently collusive or fraudulent. *Damron v. Sledge*, 105 Ariz. 151, 153, 460 P.2d 997, 999 (1969); *Critz*, 230 Cal.App.2d at 802, 41 Cal.Rptr. at 409. Such agreements are consistent with the general rule of indemnity that permits insureds to protect themselves against insurers who wrongfully refuse to defend.

■ An assignment is a transfer to another of the whole of any property or right in the property. *Broyles v. Iowa Dep't of Social Servs.*, 305 N.W.2d 718, 721 (Iowa 1981) (citation omitted). In such transfers, the assignee assumes the rights, remedies and benefits of the assignor. *Id.* at 723 (citation omitted). On the other hand, the assignee also takes the property subject to all defenses to which the assignor is subject. *Van Maanen v. Van Maanen*, 360 N.W.2d 758, 762 (Iowa 1985); Iowa Code § 539.1. Choses in action whether for breach of contract or for tort are assignable in this state. *Fischer v. Klink*, 234 Iowa 884, 888, 14 N.W.2d 695, 698 (1944). In light of these rules and because insurers have available to them a variety of defenses—for example, coverage, fraud, and collusion—we fail to see why legally it should make any difference who sues the insurer—the insured or the insured's assignee.

■ We view the assignment here as a remedy in addition to, and not in contravention of, Iowa Code section 516.1, Iowa's direct action statute. Section 516.1 allows an injured party to sue the insurer "in [the] event an execution on a judgment against the insured be returned unsatisfied in an action by a person who is injured or whose property is damaged." Iowa Code § 516.1. We have held that this statute is not the exclusive remedy that an injured party has against a liability insurer under a liability policy like the one here. *Steffens v. American Standard Ins. Co.*, 181 N.W.2d 174, 177 (Iowa 1970).

■ Under such policies, when the insured has become legally liable to an injured person, as by a judgment in favor of that person and against the insured, a debt arises from the insurer to its insured. If the insurer does not pay, the insured as promisee in the policy has a cause of action against the insurer.

One of the remedies the injured party has is found in Iowa Code section 626.21, which provides:

Judgments, money, bank bills, and other things in action may be levied upon, and sold or appropriated thereunder, and *an assignment thereof by the officer shall have the same effect as if made by the defendant.*

Iowa Code § 626.21 (emphasis added). This is the remedy the plaintiff pursued in *Stef-*

*fens.* We held that the plaintiff (1) stepped into the shoes of the insured, (2) owned the insured's causes of action against the defendant insurers, and (3) could sue them on those causes of action, notwithstanding section 516.1. *Id.* at 176–78.

The purpose of the direct action statute— we said—was not to cut down the rights of third parties. Nor was it enacted because third parties had no remedy under liability insurance policies like the one here. Such parties could reach the insurer by using procedural tools like the levy procedure in section 626.21. *Id.* at 177.

The purpose was to give relief to injured third parties in the indemnity insurance situation. Under that kind of policy, the insurer promises to pay after the insured has paid the injured third party. So if the insured could not pay the third party, the insured could not recover from the insurer and neither could the hapless third party. *Id.* at 177. The third party could not recover because there was no privity of contract between such party and the insurer. *Pries v. M.F.A. Mut. Ins. Co.*, 255 Iowa 442, 445, 122 N.W.2d 925, 927 (1963). We noted in *Steffens* that nothing in the language of section 516.1 indicates that the third party's traditional remedies to reach liability insurance policies like the one here are abrogated. *Steffens*, 181 N.W.2d at 177.

Following the reasoning in *Steffens*, we conclude there is nothing in section 516.1 that prohibits prejudgment assignments in return for covenants not to execute. We conclude that such agreements are not inherently fraudulent or collusive. Nor are they in contravention of section 516.1, the direct action statute.

■ Fourth, we see nothing in settlement agreements like the one here that would tend to be injurious to the public or contrary to the public good. *See Walker v. American Family Mut. Ins. Co.*, 340 N.W.2d 599, 601 (Iowa 1983) (contract contravening public policy will not be enforced; a contract is contrary to public policy if it tends to be injurious to the public or contrary to the public good ("[T]he power to invalidate a contract on public policy grounds must be used cautiously and exercised only in cases

free from doubt."). To the contrary, a logical extension of *Fullerton* would recognize the need for such agreements as protection against an insurer's wrongful refusal to defend under the policy.

We agree with Red Giant that implicit in the *Freeman* and Iowa district court holdings is a policy determination. That policy determination is that it is better to allow an insurer to breach its duty to an insured and escape liability than to risk occasional fraud or collusion. We think such a policy determination would render meaningless the rule of indemnity in wrongful refusal to defend cases and ignores the law of assignment.

■ Last, the fear that fraud or collusion is possible should not be the test. We rejected a similar argument in disposing of interspousal immunity, noting that our system of justice "is adequately equipped to discern the existence of fraud and collusion." *Shook v. Crabb*, 281 N.W.2d 616, 620 (Iowa 1979).

When the insurer has wrongfully refused to defend and the insured reaches a settlement with the injured party, most courts have held that a settlement is presumptive evidence of the liability of the insured and the amount of damages. In addition, the insurer has the burden of rebutting this presumption by showing the settlement was procured as a result of fraud or collusion. *Griggs v. Bertram*, 88 N.J. 347, 362, 443 A.2d 163, 172 (1982) (citing the jurisdictions following the rule). Indeed, this court long ago embraced this rule. *Jones*, 210 Iowa at 69, 230 N.W. at 385. As *Griggs* points out, "[t]his rule is consistent with the general assumption that in the absence of contrary evidence, persons act fairly, honestly, and in good faith." *Griggs*, 88 N.J. at 364, 443 A.2d at 172.

But here the judgment is not an adjudication on the merits. It is only the settlement Red Giant and Coyle reached. There was no real trial. So in these circumstances, while the judgment is binding and valid as to Coyle and Red Giant, it is not conclusive as to LeMars, the insurer. *See Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn.1982) (reaching the same conclusion as to settlement reached under circumstances similar to those here).

In these circumstances we think the indemnity rule applicable where insurers wrongfully refuse to defend should be modified as the court did in *Miller.* Following this indemnity rule, the court imposed the burden of persuasion on the insurer to prove a stipulated judgment between the insured and the injured party was reached through fraud or collusion and therefore unenforceable against the insurer. *Miller,* 316 N.W.2d at 734. The insurer in *Miller* never pled fraud nor collusion. Nor did the insurer submit affidavits in opposition to the injured party's motion for summary judgment or other evidence to make out any fact issue of fraud or collusion. So the court found as a matter of law that the judgment was not obtained by fraud or collusion. *Id.*

But the inquiry did not end there. The court went one step further and required a showing that the settlement on which the judgment was based was reasonable and prudent. *Id.* at 734–35. As to this issue, the court imposed the burden of persuasion on the injured party. In doing so, the court adopted an objective test: "what a reasonably prudent person in the position of the defendant would have settled for on the merits of the plaintiff's claim." *Id.* at 735. This test—the court explained—"involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Id.*; *see also Wolff v. Royal Ins. Co.,* 472 N.W.2d 233, 235 (S.D.1991) (citation omitted) ("As a general rule, when an insurer declines coverage, an insured may settle rather than proceed to trial to determine its legal liability. However, the amount must be reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured."); *Luria Bros. & Co. v. Alliance Assur. Co.,* 780 F.2d 1082, 1091 (2d Cir.1986) (citation omitted) ("[T]o recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled 'so long as ... a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured].").

We hold therefore that in settlements like the one here, an insurer, relying on fraud or collusion, must plead and prove these defenses. If either defense is proven, the settlement is invalid and unenforceable against the insurer. The injured party, however, has the burden to prove by a preponderance of the evidence that (1) the underlying claim was covered by the policy, and (2) the settlement which resulted in the judgment was reasonable and prudent. The test the fact finder must apply on this issue is what a reasonable and prudent person in the position of the defendant (Coyle) would have paid to settle the plaintiff's (Red Giant's) claim. In applying this test, the fact finder must consider facts bearing on the liability and damage aspects of the claim as well as the risks of going to trial.

The fraud and collusion issues are fact questions and so are the issues of reasonableness and prudence. Here none of these issues were established as a matter of law. They are material issues of fact and therefore not subject to summary judgment determination. The district court found no evidence of fraud or collusion but was merely concerned about the *possibility* of fraud or collusion. Unlike the facts in *Roach,* there was no showing that Red Giant was directing the actions of Coyle and his attorneys. Also left unresolved is the coverage issue, a determination of which might render these other issues moot as far as LeMars is concerned.

Because of the conclusions we reach, we must reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**